**Jacobo Rey ELMORE, Plaintiff,**

v.

**Charles B. MONTGOMERY and Charles B. Montgomery, Jr., individually and trading as Montgomery Construction Company, Defendants.**

**Civ. A. No. 65–1308.**

United States District Court

W. D. Pennsylvania.

Dec. 12, 1967.

Ned. J. Nakles and Lightcap, McDonald & Moore, Latrobe, Pa., for plaintiff.

Michael J. Wherry, Wherry & Ketler, Grove City, Pa., for defendants.

### OPINION

DUMBAULD, District Judge.

A Peruvian lawyer sues here for a fee for services rendered to a Pennsylvania partnership which obtained a contract to construct an extensive irrigation project in Peru. The contractor's performance was unsatisfactory to the Peruvian government, which cancelled the contract, seized the partnership's assets in Peru, and finished the job through the sub-contractors. There were large claims against the partnership on the part of creditors, and a real possibility that these claims constituted a personal

liability which might be asserted against defendants in Pennsylvania.

The Gibson bank in Peru was itself a creditor, and suggested that defendants employ plaintiff as attorney in negotiations for a settlement. The plan adopted was for the Peruvian government (which had seized valuable equipment and property of defendants) to settle with the creditors, giving defendants what was in effect a complete release from further liability.

Defendants paid a large "finder's fee" or "kick-back" in connection with obtaining the construction contract, including *inter alia* a large fee to Dr. Yrigoyen, a prominent Peruvian lawyer. Yrigoyen brought suit to recover an unpaid balance of $70,000.00. Defendants, who believed Yrigoyen had been paid enough, employed plaintiff (over his own advice to employ another lawyer) in this suit, in which he had some success though defendants did not answer his letters or otherwise cooperate with him after he had rendered a bill for services.

Defendants' contention is that they believed that the Gibson bank would pay for plaintiff's services to defendants. No such arrangement was ever reduced to writing, but it is very plain that defendants did give plaintiff a written power or powers of attorney, and in the precise form he required, in order to avail themselves of his services.

We are satisfied, and find as a fact, that plaintiff did in fact perform valuable services for defendants in the negotiations regarding the settlement with creditors, and release of defendants from further liability on claims which conceivably might have been asserted in Pennsylvania against defendants for approximately $1,200,000.00, as well as in handling the Yrigoyen suit involving a claim for $70,000.00.

The work performed by plaintiff in the settlement involved repeated negotiations with government departments, on account of political changes in personnel, in order to convince the government to assume the claims of creditors and to release defendants. The Yrigoyen case involved trial and appellate work of the usual forensic character.

■ We are therefore satisfied that plaintiff is entitled to a reasonable fee, and find that $12,500.00 would be appropriate compensation.

We find no merit in the other defenses of statute of limitations or conflict of interests.

Accordingly judgment is entered for plaintiff in the amount of $12,500.00.

In accordance with the foregoing opinion, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff Jacobo Rey Elmore is a citizen of the Republic of Peru, with mailing address at A. Miro Quesada 376, Office 309, Casilla No. 1106, Lima, Peru. He is a lawyer.

2. Defendants Charles B. Montgomery and Charles B. Montgomery, Jr., are partners trading as Montgomery Construction Company. They are in the general construction business and their principal place of business is located within the jurisdiction of the District Court of the United States for the Western District of Pennsylvania, at 803 W. Main Street, Grove City, Pennsylvania.

3. The amount in controversy in each count of the complaint exclusive of costs and interest, exceeds the sum of $10,000.00.

4. On July 6, 1955, the government of the Republic of Peru entered into a contract with defendant Montgomery Construction Company for the construction of what was known as Choclococha Project. It was the purpose of this massive irrigation project to divert the waters of Lake Choclococha in the highlands of Peru to the Ica River below. The project contemplated open canals, tunneling and a great deal of excavation and construction. The total contract was in the approximate amount of $10,000,000.00.

The Parties to the contract were Montgomery Construction Company of Grove City, Pennsylvania, U. S., and Republic of Peru.

5. At or about the commencement of the Choclococha Project, the Republic of Peru paid Montgomery Construction Company approximately $2,000,000.00 with which to purchase the equipment necessary to begin and carry on the construction.

6. The original contract stipulated that Peruvian law was to govern its terms and that, by signing the contract, Montgomery agreed to accept the jurisdiction of the Peruvian courts. These provisions are valid in accordance with Peruvian law.

7. On or about September 20, 1957, by Supreme Resolution No. 178, the government of Peru canceled its contract with Montgomery Construction Company, stating, among other items, the following reasons: "Lack of organization and efficiency of Montgomery Construction Company, which * * * has become so serious that there is a lack of technical and administrative personnel and laborers * * * The company for several months has ceased payment of its obligations, provoking labor disputes and causing work stoppages * * * *"

8. On or about October 1, 1957, by Supreme Resolution No. 179, the Republic of Peru continued the project employing the sub-contractors of Montgomery Construction Company.

9. The contract itself provided for the unilateral rescission by the Peruvian government under the circumstances stated in Resolution No. 178.

10. The contract provided for a penalty against Montgomery in the amount of 5% of the work to be completed, which could have been $112,090.00 at the time of rescission. After the contract cancellation by Peru, many claims against Montgomery arose and many disputes existed between Montgomery and the Republic of Peru. These claims amounted to approximately $1,200,000.-00 in debts owing both to the government and commercial creditors.

11. On October 7, 1957, when negotiations between Montgomery and the government reached an impasse, the Gibson bank suggested to Montgomery that he hire Dr. Rey to represent him.

12. On October 9, 1957, Montgomery cabled Dr. Quesada of Gibson Bank: "Cabled authorization Doctor Re Elmore. Authorization confer government pay creditors Choclococha Project."

13. Also on October 9, 1957, Montgomery cabled plaintiff Rey: "Authorize you arrange government Peru payment creditors whose money is invested in Choclococha Project * * * document forthcoming."

14. On October 11, 1957, Plaintiff Rey cabled Charles B. Montgomery for a "general power of attorney legalized Peruvian consulate authorizing me to deal on your behalf with Peruvian Government in order to reach a satisfactory agreement with regard to effects of the contract of Choclococha unilaterally taken over and payment of creditors.

15. On October 17, 1957, Montgomery Construction Company, by Charles B. Montgomery, executed a Power of Attorney appointing Plaintiff Jacobo Rey "my true and lawful attorney to act for and represent Montgomery Construction Company in negotiations in our behalf with the Government of Peru to reach a satisfactory conclusion on the settlement of the contract on the Choclococha Project." This power was prepared by Charles B. Montgomery in English. It was typed in green ink and signed in green ink, the same color used by Montgomery in his other correspondence.

16. On November 27, 1957, Charles B. Montgomery, as President of Montgomery Construction Company of Lima, Peru, executed a Power of Attorney appointing plaintiff Jacobo Rey "my true and lawful attorney to act for and represent the Montgomery Construction Company of Lima, Peru in signing, with approval, a satisfactory negotiation and settlement with the government of Peru regarding the Choclococha Project." This power was also prepared by Mr. Montgomery in English, and in green ink.

Since it contained restrictions, Dr. Rey could not use it.

17. On November 29, 1957, Plaintiff Jacobo Rey cabled Montgomery requesting power of attorney "to sign with the Government the settlement of Choclococha contract and transfer all your machinery and equipment in Peru to the Government in cancellation of your debt to Government and your creditors on basis accepted by them."

18. On December 27, 1957, Plaintiff Jacobo Rey wrote a letter to Charles B. Montgomery requesting a wider power of attorney ("if you want me to represent you") executed in the name of "Montgomery Construction Company of Grove City Penn." and not Montgomery Construction Company of Lima, Peru. The letter also stated: "This is the only way in which I can offer you my professional assistance in this matter."

19. On January 8, 1959, Charles B. Montgomery wrote a letter to plaintiff Jacobo Rey Elmore enclosing the wider Power requested, and. stating: "I hope you will continue to press upon the authorities the necessity for reaching a final settlement in the terms and conditions which will relieve me and my firm of all past, present and future responsibilities, both financial and technical."

20. The Power referred to in the preceding finding was executed by Charles B. Montgomery of Montgomery Construction Company "de Grove City, Pennsylvania." In translation, a portion of the THIRD paragraph states that plaintiff Rey "is fully authorized with no limitation to represent me before civil, political or administrative authorities of Peru * * * " This is the power under which Dr. Rey negotiated with the government on behalf of Montgomery.

21. On April 2, 1958, C. B. Montgomery cabled plaintiff Jacobo Rey Elmore in part as follows: "Have creditors been paid by government * * * when can we expect government to sign release for us of all obligations?"

22. On April 8, 1958, plaintiff Jacobo Rey cabled Montgomery to the effect that political changes and problems delayed the agreement with the creditors.

23. Each political change brought about changes in the Ministers with which Dr. Rey had to deal and this complicated his work in trying to effect a settlement for Montgomery. Dr. Rey was required to explain the problem from the very beginning to each new Minister and to prepare memoranda and to get an appointment to see the Ministers. There were six (6) Ministers of Finance and six (6) Ministers of Public Works with which Dr. Rey had to negotiate.

24. On May 6, 1958, plaintiff Jacobo Rey cabled Charles B. Montgomery explaining the negotiations with the government and requesting further authorization.

25. On May 7, 1958, plaintiff Jacobo Rey wrote a letter to Charles B. Montgomery explaining his negotiations and requesting a cable answer to Dr. Rey's cable referred to in the preceding finding.

26. On May 8, 1958, C. B. Montgomery sent the following cablegram to plaintiff Jacobo Rey Elmore: "You have my power of attorney in your possession to sign documents with government. This cable again is your authority to sign documents with government according to your cable."

27. On November 5, 1958, plaintiff Jacobo Rey Elmore wrote another letter to Charles B. Montgomery explaining in detail negotiation with the government and certain creditors. In this letter Dr. Rey suggested that he be paid part of his professional fees since he had worked for Montgomery for more than a year. He received no response to this request from Montgomery.

28. On December 17, 1959, plaintiff wrote a letter to Charles B. Montgomery explaining further in detail the negotiations plaintiff had been undertaking with the government. The letter explained that Dr. Rey saved Charles B. Montgomery the payment of debts to the government and creditors in a total amount of over $1,200,000.00 and requesting a fee of $24,000.00 "which is less than 2% of

your liquid debt." Montgomery made no complaint about the amount of the fee.

29. On April 26, 1960, plaintiff Jacobo Rey Elmore wrote a letter to Charles B. Montgomery telling him that he had not answered his previous five letters. This letter also stated: "Further, as I have not received any refusal from you I take for granted that you agree in all respects with the fee and form of payment suggested, which is perfectly safe for you and for myself."

30. During the period of time from October 7, 1957, when Dr. Rey was first contacted by Montgomery, and throughout the period of time until the final settlement in 1963, and thereafter, Dr. Rey worked continually from time to time on Montgomery's behalf.

31. On May 14, 1958, plaintiff Jacobo Rey Elmore wrote a letter to Charles B. Montgomery informing him of an action by Dr. Yrigoyen, a prominent and influential Peruvian lawyer seeking to recover $70,000.00 as the balance of a $270,000.00 legal fee relating to the award of the original contract. He admitted being paid $200,000.00. Dr. Rey requested information from Montgomery relative to this debt.

32. On May 20, 1958, C. B. Montgomery sent a letter to plaintiff Jacobo Rey Elmore informing him that Dr. Yrigoyen was paid a total of $350,000.00 and that he considered that he was paid in full. The letter also stated: "I am anxious to have all affairs regarding the creditors and the government settled as quickly as possible and trust this suit of Dr. Yrigoyen does not delay settlement * * * I have sent your additional power of attorney to New York City for the Peruvian Seal."

33. On May 22, 1958, plaintiff Jacobo Rey Elmore wrote a letter to Charles B. Montgomery informing and discussing with him the Yrigoyen suit against Montgomery. Dr. Rey suggested that Montgomery appoint Dr. Carlos Thorne to represent him in this action.

34. Without Dr. Rey's knowledge, Montgomery designated Dr. Rey to represent him in the Yrigoyen action by executing a Power of Attorney on May 27, 1958 in the office of Consul General of Peru in New York. This appointment was made by Montgomery in spite of Dr. Rey's suggestion that Dr. Thorne be appointed. Dr. Rey was not informed of the appointment until April of 1963.

35. After Dr. Rey wrote several letters, on April 24, 1963, plaintiff Jacobo Rey Elmore sent a letter to Charles B. Montgomery informing him that he had been continuously working on his behalf "to reach an agreement with the Peruvian government according to your instructions." The letter further asked for proof of payments totaling $350,000.00 to Dr. Yrigoyen for use in the Yrigoyen suit against Charles B. Montgomery. The letter concluded: "if you can give us any of that information it would be very helpful not only in the suit initiated by Dr. Yrigoyen but also in the agreement which we are working with the Peruvian government."

36. No reply was made by either defendant to the letter referred to in the preceding paragraph, embodied in plaintiff's exhibit No. 12.

37. On June 5, 1963, plaintiff Jacobo Rey Elmore wrote a letter to Charles B. Montgomery again requesting proof for use in the Yrigoyen action against Montgomery. On July 5, 1963, plaintiff Jacobo Rey Elmore cabled Charles B. Montgomery of the urgent need for the checks with which Yrigoyen was paid. No answer to this cable was made by either defendant. On October 18, 1963, plaintiff Jacobo Rey Elmore wrote a letter to Charles B. Montgomery informing him of the progress in the Yrigoyen case and again making a request for copies of the receipts or checks or other documents to prove payment of $350,000.00 to Dr. Yrigoyen. Neither defendant ever supplied proof to plaintiff of payments by Montgomery Construction Company to Dr. Yrigoyen of the sum of $350,000.00.

38. Despite Montgomery's lack of cooperation in the Yrigoyen suit, Dr. Rey defended Montgomery before a single judge who found a judgment against

him in the sum of $70,000.00. On appeal to the Superior Court, three judges reversed the lower court. Dr. Yrigoyen appealed to the Supreme Court, which decided that the Superior Court had found in error, and directed that Court to hear the case over. This time, the Superior Court favored Dr. Yrigoyen. Upon appeal to the Supreme Court, the decision was upheld. This litigation lasted from April of 1963 until September 8, 1965, when the Supreme Court finally resolved the litigation in favor of Dr. Yrigoyen.

39. By reason of Dr. Rey's activities on defendants' behalf, the creditors were paid by the Peruvian government, obviating the possibility of personal actions against defendants in the United States.

40. The reasonable value of the services performed by plaintiff for defendants is $12,500.00.

## CONCLUSIONS OF LAW

1. The jurisdiction of the Court is based upon diversity of citizenship. 28 U.S.C.A. § 1332. The amount in controversy exceeds $10,000.00, exclusive of costs and interest.

2. This action is not barred by any statute of limitations.

3. Defendant Charles B. Montgomery appointed Plaintiff, Jacobo Rey Elmore, his attorney in the government settlement of the Choclococha project and the Yrigoyen action; and an Attorney-client relationship existed between the two during the events in question.

4. Plaintiff is entitled to judgment against defendants in the amount of $12,500.00.

5. Defendant, Charles B. Montgomery, Jr. as a partner, is liable jointly for partnership obligations incurred before he became a partner.

6. There was no conflict of interest in Plaintiff's representation of defendants.